**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        v.<br><br>CHARLES C. LYNCH,<br><br>                   Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CR 07-0689-GW<br><br>**SENTENCING MEMORANDUM** |

## I.   <u>INTRODUCTION</u>

On August 5, 2008, defendant Charles C. Lynch was convicted by a jury of five counts of violating the federal Controlled Substance Act ("CSA"), 21 U.S.C. §§ 801 <u>et</u> <u>seq.</u>  The charges arose out of his establishing and operating a medical marijuana facility - <u>i.e.</u> the Central Coast Compassionate Caregivers in Morro Bay, California.

In reaching the sentence in this matter, this Court has reviewed and considered <u>inter</u> <u>alia</u> the following: 1) the Indictment (Doc. No. 1)[1] and the "redacted" Indictment provided to the jury (Doc. No. 161); 2) the evidence admitted during the trial which began on July 23, 2008; 3) "Government's Sentencing Position for Defendant Charles

---

[1]   Reference to the documents filed in this criminal case in the United States District Court, Central District of California's Case Management/Electronic Case Filing ("CM/ECF") will be to the "Document number" ("Doc. No.") indicated in the CM/ECF.

C. Lynch" (Doc. No. 232); 4) "Declaration of Special Agent Rachel Burkdoll in Support of Government's Sentencing Position; Exhibits" (Doc. No. 236); 5) "Government's Position Re: Applicability of Mandatory Minimum Sentence to Defendant Charles C. Lynch" (Doc. No. 238); 6) Notice of Lodging of Mr. Lynch's Initial Position re: Applicability of the Mandatory Minimum Sentence; Exhibits" (Doc. No. 244); 7) "Charles Lynch's Position re: Sentencing Factors; Exhibits" (Doc. No. 245); 8) "Declaration in Support of Charles Lynch's Position re: Applicability of the Mandatory Minimum Sentence" (Doc. No. 246); 9) "Government's Amended Position on Applicability of Safety Valve Provision to Defendant Charles C. Lynch" (Doc. No. 249); 10) "Government's Amended Position on Applicability of Mandatory Minimum Sentences to Defendant Charles C. Lynch" (Doc. No. 250); 11) "Government's Amended Response to Presentence Report for Defendant Charles C. Lynch" (Doc. No. 251); 12) "Government's Amended Sentencing Recommendation for Defendant Charles C. Lynch" (Doc. No. 252); 13) "Statement of Sergeant Zachary Stotz in Support of Charles C. Lynch's Position re: Sentencing Factors (Doc. No. 253); 14) "Defendant's Reply to Government's Position re: Applicability of the Mandatory Minimum Sentences (Doc. No. 254); 15) "Defendant's Reply to Government's Position re: Sentencing Factors; Declaration of Charles C. Lynch" (Doc. No. 255); 16) Letters of Jurors and Prospective Jurors (Doc. Nos. 257, 258 and 262); 17) United States Probation Office ("USPO") Presentence Investigation Report (Doc. No. 259) and Addendum to the Presentence Report (Doc. No. 260); 18) USPO Recommendation Letter initially dated November 24, 2008 (Doc. No. 314); 19) "Letters in Support of Defendant's Position re: Sentencing Factors" (Doc. No. 264); 20) "Charles Lynch's Amended Initial Position re: Applicability of the Mandatory Minimum Sentence" (Doc. No. 265); 21) "Statement in Support of Defendant's Position re: Sentencing" (Doc. No. 266); 22) "Government's Notice re Defendant Charles C. Lynch" (Doc. No. 267); 23) "Government's Response to Inquiry by the Court Regarding Sentencing" (Doc. No. 276); 24) Abram Baxter's Video-Taped "Statement

in Support of Defendant's Position re: Sentencing" (Doc. No. 277); 25) "Declaration of Joseph D. Elford in Support of Charles C. Lynch's Position re: Sentencing" (Doc. No. 279); 26) "Supplemental Letters in Support of Charles C. Lynch's Position re: Sentencing" (Doc. No. 280); 27) "Charles Lynch's Supplemental Memorandum of Points and Authorities re: Sentencing; Exhibits" (Doc. No. 285); 28) Government's Response to the Court's Inquiries During April 23, 2009 Hearing; Exhibits" (Doc. No. 286); 29) "Government's Filing re Defendant Charles C. Lynch" (Doc. No. 287); 30) "Government's Response to Defendant's Supplemental Memo of Points and Authorities re Sentencing" (Doc. No. 290); 31) "Charlie Lynch's Reply to Government's Response to Court's Inquiries During April 23, 2009 Hearing" (Doc. No. 289); 32) "Charlie Lynch's Reply to Government's Response to Supplemental Memorandum of Points and Authorities re: Sentencing" (Doc. No. 296); 33) "Supplemental Exhibit in Support of Charles Lynch's Position re Sentencing" (Doc. No. 297); 34) the other materials contained in the Court's file including previously submitted evidentiary material; 35) statements made on behalf of Lynch at the sentencing hearings on March 23, April 23 and June 11, 2009; and 36) the arguments of counsel on said dates.  Pursuant to 18 U.S.C. § 3553(c), this Court issues this Sentencing Memorandum which incorporates its prior positions as stated at the sentencing hearings but also more fully delineates the bases for its imposition of the sentence on Defendant Lynch.

## II.    BACKGROUND

### A.  The Conviction

Lynch was convicted of the following five counts: 1) conspiracy - (a) to possess and distribute "at least" 100 kilograms of marijuana, "at least" 100 marijuana plants, and items containing tetrahydrocannabinol ("THC"), (b) to maintain a premises for the distribution of such controlled substances, and (c) to distribute marijuana to persons under the age of 21 years - in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B), 856 and 859; 2 and 3) sales of more than 5 grams of marijuana to J.S., a

person under the age of 21, on June 10 and August 27, 2006 in violation of 21 U.S.C. §§ 841(a)(1) and 859(a); 4) on March 29, 2007, possession with the intent to distribute approximately 14 kilograms of material containing a detectable amount of marijuana and at least 50 but less than 100 marijuana plants in violation of 21 U.S.C. § 841(a)(6) and (b)(1)(B); and 5) between about February 22, 2006 and March 29, 2007, maintaining a premises at 780 Monterey Avenue, Suite B, Morro Bay, California under the name "Central Coast Compassionate Caregivers" ("CCCC") for the purpose of growing and distributing marijuana and THC. See the Verdict (Doc. No. 175); the redacted Indictment (Doc. No. 161).

## B. The Legality of Medical Marijuana Dispensaries Under California and Federal Laws

The CSA establishes five schedules of controlled substances. 21 U.S.C. § 812(a). To fall within Schedule I, it must be found that:

> (A) The drug or other substance has a high potential for abuse.
> (B) The drug or other substance has no currently accepted medical use in treatment in the United States.
> (C) There is a lack of accepted safety for use of the drug or other substance under medical supervision.

21 U.S.C. § 812(b)(1). Congress has designated both marijuana and THC as Schedule I controlled substances.[2] 21 U.S.C. § 812(c) - (Schedule I)(c)(10) and (17). As noted in Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 425 (2006):

> Substances listed in Schedule I of the Act are subject to the most comprehensive restrictions, including an outright ban on all importation and use, except pursuant to strictly regulated research projects. See [21 U.S.C.] §§ 823, 960(a)(1). The Act authorizes the imposition of a criminal sentence for simple possession of Schedule I substances, see §

---

[2]    The CSA allows the United States Attorney General to transfer a controlled substance designation from one schedule to another or to remove it from the schedules entirely if it no longer meets the requirements for such inclusion. 21 U.S.C. § 811(a). However, attempts to move marijuana from Schedule I (which began in 1972) have proved unsuccessful both on the administrative level, see, e.g., 66 Fed.Reg. 20038 (2001), and in the courts, see, e.g., Alliance for Cannabis Therapeutics v. DEA, 15 F.3d 1131, 1133 (D.C. Cir. 1994). See Gonzales v. Raich, 545 U.S. 1, 15 n.23 (2005).

844(a), and mandates the imposition of a criminal sentence for possession "with intent to manufacture, distribute, or dispense" such substances, see §§ 841(a), (b).

Thus, federal law prohibits the manufacture (i.e. cultivation), distribution, sale or possession (with intent to distribute) of marijuana. 21 U.S.C. § 841(a)(1).

In 1996, California voters passed Proposition 215, known as the "Compassionate Use Act of 1996" ("CUA"), which is codified in California Health & Safety Code ("Cal. H & S Code") § 11362.5. See Gonzales v. Raich, 545 U.S. 1, 5-6 (2005). The purpose of Proposition 215 was to "ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment" of certain conditions such as cancer, glaucoma, "or any other illness for which marijuana provides relief." Cal. H & S Code § 11362.5(b)(1)(A). A goal of Proposition 215 (which has not been achieved to date) is to "encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana."[3] Id. at § 11362.5(b)(1)(C). The operative sections of the CUA provide that: 1) "no physician in this state shall be punished, or denied any right or privilege, for having recommended marijuana to a patient for medical purposes," and 2) "[Cal. H & S Code] Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." Id. at § 11362.5(c) and (d). The term "primary caregiver" is defined in the CUA as "the

---

[3]     Not to be critical of Proposition 215 or the efforts of California legislators after its passage, it would appear rather obvious that, as a matter of federal law, - until such time as marijuana is removed or downgraded from the CSA's list of Schedule I controlled substances - there could never be any coordination or consistency between the federal and state governments in regards to allowing the use of marijuana for medicinal purposes. See infra; see also Raich, 545 U.S. at 33.

individual designated by the person exempted under this section who has consistently assumed responsibility for the housing, health, or safety of that person." Id. at § 11362.5(e).

After the passage of the CUA, the California courts recognized that, "except as specifically provided in the [CUA], neither relaxation much less evisceration of the state's marijuana laws was envisioned." People v. Trippet, 56 Cal. App. 4th 1532, 1546 (1997) ("We accordingly have no hesitation in declining appellant's rather candid invitation to interpret the statute as a sort of 'open sesame' regarding the possession, transportation and sale of marijuana in this state."). The issue of medical marijuana dispensaries under California law following the enactment of CUA was first considered in People ex rel Lungren v. Peron, 59 Cal. App. 4th 1383 (1997). Therein, just before the passage of the CUA, the trial court granted a preliminary injunction enjoining defendants from selling or furnishing marijuana at a premises known as the "Cannabis Buyers' Club." After the enactment of § 11362.5, the trial court modified the injunction to allow the defendants to possess and cultivate medical marijuana for their personal use on the recommendation of a physician or for the personal medicinal use of persons with medical authorization who designated the defendants as their primary caregivers, so long as their sales did not produce a profit. The court of appeal vacated the modification of the preliminary injunction finding that the CUA did not sanction the sale of marijuana even if it was on a non-profit basis and for medicinal purposes, and that marijuana providers such as the Cannabis Buyers' Club could not be designated as "primary caregivers" because they do not "consistently assume[] responsibility for the housing, health or safety" of their customers. Id. at 1395-97. See also People v. Galambos, 104 Cal. App. 4th 1147, 1165-69 (2002) (holding that Proposition 215 cannot be construed to extend immunity from prosecution to persons who supply marijuana to medical cannabis cooperatives).

In United States v. Oakland Cannabis Buyers' Cooperative, 532 U.S. 483 (2001), federal authorities brought an action to enjoin (and subsequently a contempt

motion against) a non-profit medical marijuana cooperative that had been distributing marijuana to persons with physician's authorizations under the CUA. The cooperative raised a defense of medical necessity that was rejected by the district court but accepted by the Ninth Circuit. The Supreme Court reversed the Ninth Circuit's decision because "in the Controlled Substances Act, the balance already has been struck against a medical necessity exception." Id. at 499. As explained by the Court:

> Under any conception of legal necessity, one principle is clear: The defense cannot succeed when the legislature itself has made a "determination of values." . . . . In the case of the Controlled Substances Act, the statute reflects a determination that marijuana has no medical benefits worthy of an exception (outside the confines of a Government-approved research project). Whereas some other drugs can be dispensed and prescribed for medical use, see 21 U.S.C. § 829, the same is not true for marijuana. Indeed, for purposes of the Controlled Substance Act, marijuana has "no currently accepted medical use" at all. § 811.

Id. at 491.

In 2003, the California Legislature enacted the Medical Marijuana Program Act ("MMPA") (Cal. H & S Code §§ 11362.7 to 11362.9) wherein it sought to:

> (1) Clarify the scope of the application of the [Compassionate Use Act] and facilitate the prompt identification of qualified patients and their designated primary caregivers in order to avoid unnecessary arrest and prosecution of these individuals and provide needed guidance to law enforcement officers. (2) Promote uniform and consistent application of the [Compassionate Use Act] among the counties within the state. (3) Enhance the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects.

California Stats. 2003, ch. 875, § 1, subd. (B); see also People v. Urziceanu, 132 Cal. App. 4th 747, 783 (2005). Among the provisions of the MMPA are: 1) the establishment through the California Department of Health Services of a voluntary program for the issuance of identification cards to qualified patients who satisfy the requirements of the MMPA, see Cal. H & S Code § 11362.71(a); 2) a bar under California law providing that "No person or designated primary caregiver in possession of a valid identification card shall be subject to arrest for possession, transportation,

delivery, or cultivation of medical marijuana in an amount established [in the MMPA], unless there is reasonable cause to believe that the information contained in the card is false or falsified, [or] the card has been obtained by means of fraud," see id. at § 11362.71(e); and 3) the setting of a maximum of eight ounces of dried marijuana and "no more than six mature or 12 immature marijuana plants per qualified patient," see id. at § 11362.77(a).[4] "Primary caregiver" is given substantially the same meaning in the MMPA as it has in the CUA. Compare Cal. H & S Code § 11362.5(e) with § 11362.7(d). The MMPA envisioned collective and/or cooperative cultivation of marijuana for medical purposes. See Cal. H & S Code § 11362.775 which states:

> Qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, who associate within the State of California in order collectively or coopera-tively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions . . . .

However, Cal. H & S Code § 11362.765(a) provides that: "nothing in this section shall . . . authorize any individual or group to cultivate or distribute marijuana for profit." Nevertheless, a primary caregiver can receive "compensation for actual expenses, including reasonable compensation incurred for services provided to an eligible qualified patient or person with an identification card to enable that person to use marijuana under [the MMPA] . . . ." Id. at § 11362.765(c).

The MMPA was observed to be "a dramatic change in the prohibitions on the

---

[4]    As observed in Raich, 545 U.S. at 32 n.41, "the quantity limitations [in § 11362.77(a)] serve only as a floor . . . . and cities and counties are given *carte blanche* to establish more generous limits. Indeed, several cities and counties have done just that. For example, patients residing in the cities of Oakland and Santa Cruz and in the counties of Sonoma and Tehama are permitted to possess up to 3 pounds of processed marijuana."

    Moreover, in People v. Kelly, 47 Cal. 4th 1008 (2010), the California Supreme Court held that the MMPA (enacted by the California legislature at Cal. H & S Code § 11362.77(a)) - insofar as it set amount limitations which would burden the defense to a criminal charge of possessing or cultivating marijuana under the CUA (which was enacted pursuant to the California initiative process) - impermissibly amended the CUA and, in that respect, is invalid under the California Constitution, Article II, Section 10(c). Id. at 1049. Consequently, under California law, a patient or primary caregiver may assert as a defense in state court that he or she possessed or cultivated "an amount of marijuana reasonably related to meet his or her current medical needs . . . without reference to the specific quantitative limitations specified by the MMP[A]." Id.

use, distribution, and cultivation of marijuana for persons who are qualified patients or primary caregivers . . . ." <u>Urziceanu</u>, 132 Cal. App. 4th at 785. It was viewed as contemplating "the formation and operation of medicinal marijuana cooperatives that would receive reimbursement for marijuana and the services provided in conjunction with the provision of that marijuana." <u>Id.</u>

In <u>Raich</u>, the Supreme Court addressed the issue of "whether the power vested in Congress by Article 1, § 8 of the Constitution '[t]o make all Laws which shall be necessary and proper for carrying into Execution' its authority to 'regulate Commerce with foreign Nations, and among the several States' includes the power to prohibit the local cultivation and use of marijuana in compliance with California law." 545 U.S. at 5. Its answer was yes. The Court vacated the Ninth Circuit's decision ordering preliminary injunctive relief which was based on a finding that the plaintiffs therein had "demonstrated a strong likelihood of success on their claim that, as applied to them, the CSA is an unconstitutional exercise of Congress' Commerce Clause authority." <u>Id.</u> at 8-9. The Court did not address certain other claims raised by the plaintiffs, but not adopted by the Ninth Circuit, and remanded the case. On remand, in <u>Raich v. Gonzales</u>, 500 F.3d 850 (9th Cir. 2007) ("<u>Raich II</u>"), the Ninth Circuit did address those remaining claims and held that: 1) while the plaintiffs might have a viable necessity defense, that defense would only protect against liability in the context of an actual criminal prosecution and would not empower a court to enjoin the "enforcement of the Controlled Substance Act as to one defendant," <u>id.</u> at 861; 2) there was no substantive due process violation under the Fifth or Ninth Amendments because "federal law does not recognize a fundamental right to use medical marijuana prescribed by a licensed physician to alleviate excruciating pain and human suffering," <u>id.</u> at 866; and 3) the Supreme Court's decision in <u>Raich</u> had foreclosed plaintiffs' Tenth Amendment claim, <u>id.</u> at 867.

On August 25, 2008, pursuant to Cal. H & S Code § 11362.81(d), the California Attorney General issued "Guidelines for the Security and Non-Diversion of Marijuana

Grown for Medical Use" ("Cal. AG Guidelines"). <u>See</u> Exhibit 15 to Declaration of Special Agent Rachel Burkdoll ("Burkdoll Decl.") (Doc. No. 236); <u>see also</u> <u>People v. Hochanadel</u>, 176 Cal. App. 4th 997, 1009-11 (2009). Those guidelines recognize that "a properly organized and operated collective or cooperation that dispenses medical marijuana through a storefront may be lawful under California law" provided that it complies with the restrictions set forth in the statutes and the guidelines. <u>See</u> Cal. AG Guidelines at page 11, Exhibit 15 to Burkdoll Decl. The Cal. AG Guidelines also state that:

> The incongruity between federal and state law has given rise to understandable confusion, but no legal conflict exists merely because state law and federal law treat marijuana differently. Indeed, California's medical marijuana laws have been challenged unsuccessfully in court on the ground that they are preempted by the CSA. *(County of San Diego* v. *San Diego NORML* (July 31, 2008) ___ Ca1.Rptr.3d ___, 2008 WL 2930117.) Congress has provided that states are free to regulate in the area of controlled substances, including marijuana, provided that state law does not positively conflict with the CSA. (21 U.S.C. § 903.) Neither Proposition 215, nor the MMP, conflict with the CSA because, in adopting these laws, California did not "legalize" medical marijuana, but instead exercised the state's reserved powers to not punish certain marijuana offenses under state law when a physician has recommended its use to treat a serious medical condition.
>
> In light of California's decision to remove the use and cultivation of physician-recommended marijuana from the scope of the state's drug laws, this Office recommends that state and local law enforcement officers not arrest individuals or seize marijuana under federal law when the officer determines from the facts available that the cultivation, possession, or transportation is permitted under California's medical marijuana laws.

<u>Id.</u> at page 3.[5]

In November 2008, the California Supreme Court in <u>People v. Mentch</u>, 45 Cal. 4th 274 (2008), addressed the issue of who may qualify as a "primary caregiver" under

---

[5] The Cal. AG Guidelines' language that "no legal conflict exists" is somewhat misleading. While no such conflict existed as to California law vis-a-vis "physician recommended marijuana," there certainly remained a definite conflict between federal and California laws as to the legality and enforcement of criminal statutes concerning the cultivation, possession and distribution of marijuana for medicinal purposes.

the CUA and the MMPA. Defendant Mentch grew marijuana for his own use and for five other persons. Both he and the other five had authorizations from physicians for medical marijuana. He testified that he sold the marijuana "for less than street value" and did not make a profit from the sales. At his trial, Mentch sought to argue that he was a primary caregiver when he provided medical marijuana to the other five persons who had a doctor's recommendation. The California Supreme Court rejected that argument observing that the statutory definition of a "primary caregiver" was delineated as an individual "who has consistently assumed responsibility for the housing, health or safety" of that patient. Id. at 283; see also Cal. H & S Code § 11362.5(d). Therefore, the mere fact that an individual supplies a patient with medical marijuana pursuant to a physician's authorization does not transform that individual into a primary caregiver because he or she will not have necessarily and previously and consistently assumed responsibility for the patient's housing, health and/or safety. Id. at 284-85. The fact that the individual is the "consistent" or exclusive source of the medical marijuana for the patient makes no difference. Id. at 284-86. Likewise, "[a] person purchasing marijuana for medicinal purposes cannot simply designate seriatim, and on an ad hoc basis, . . . sales centers such as the Cannabis Buyers' Club as the patient's 'primary caregiver.'" Id. at 284 (quoting Peron, 59 Cal. App. 4th at 1396).

During a press conference on February 24, 2009, in response to a question whether raids on medical marijuana clubs established under state law represented federal policy going forward, United States Attorney General Eric Holder reportedly stated, "No, what the president said during the campaign, you'll be surprised to know, will be consistent with what we'll be doing in law enforcement. He was my boss during the campaign. He is formally and technically and by law my boss now. What he said during the campaign is now American Policy."[6] See United States v. Stacy,

---

[6] In November of 2008 during his campaign, Senator (now President) Barack Obama is reported to have stated that:
    . . . his mother had died of cancer and said he saw no difference between

No. 09cr3695, 2010 U.S. Dist. LEXIS 18467 at *12 (S.D. Cal. 2010). On March 19, 2009, Holder explained that the Justice Department had no plans to prosecute pot dispensaries that were operating legally under state laws.[7] Id.

## C.  Nature and Circumstances of Defendant's Criminal Conduct

As characterized and stated by USPO in its November 24, 2008 Sentencing Recommendation Letter ("Sent. Rec. Let.") (Doc. No. 314), with which this Court agrees:

> [T]his case is not like that of a common drug dealer buying and selling drugs without regulation, government oversight, and with no other concern other than making profits. In this case, the defendant opened a marijuana dispensary under the guidelines set forth by the State of California . . . . His purpose for opening the dispensary was to provide marijuana to those who, under California law, [were] qualified to receive it for medical reasons.

---

doctor-prescribed morphine and marijuana as pain relievers. He said he would be open to allowing medical use of marijuana, if scientists and doctors concluded it was effective, but only under "strict guidelines," because he was "concerned about folks just kind of growing their own and saying it's for medicinal purposes."

See, Bob Egelko, "Next President Might Be Gentler on Pot Clubs," San Francisco Chronicle (May 12, 2008). The same article quoted Ben LaBolt, Obama's campaign spokesman, as saying:

"Voters and legislators in the states . . . have decided to provide their residents suffering from chronic diseases and serious illnesses like AIDS and cancer with medical marijuana to relieve their pain and suffering. Obama supports the rights of states and local governments to make this choice - through he believes medical marijuana should be subject to (U.S. Food and Drug Administration) regulations like other drugs." LaBolt also indicated that Obama would end U.S. Drug Enforcement Administration raids on medical marijuana suppliers in states with their own laws.

However, morphine - as a designated Schedule II controlled substance - is recognized by federal statute as having "a currently accepted medical use in treatment in the United States," see 21 U.S.C. § 812(b)(2), and hence can be prescribed by physicians as a pain reliever. Marijuana cannot - because it is classified under federal law as a Schedule I substance and hence "has no currently accepted medical use." See 21 U.S.C. § 812(b)(1).

    [7]    In response to this Court's inquiry regarding Attorney General Holder's statements, the Government submitted a letter from H. Marshall Jarrett, Director of the Executive Office for United States Attorneys, United States Department of Justice, which indicated that the Office of the Deputy Attorney General had reviewed the facts of Lynch's case and concurred "that the investigation, prosecution, and conviction of Mr. Lynch are entirely consistent with Department policies as well as public statements made by the Attorney General." See Doc. No. 276.

Sent. Rec. Let. at page 4.

In 2005, Lynch obtained a prescription for medical marijuana to treat his headaches. See Presentence Investigation Report ("PSR") ¶ 101 at page 20 (Doc. No. 259).[8] In order to obtain "medical grade" marijuana, he drove to various marijuana dispensaries operating publicly in Santa Cruz and Santa Barbara. Id.; see also Sent. Rec. Let. at page 6. Noting the dearth of such dispensaries in San Luis Obispo County where he resided, Lynch investigated opening such an enterprise. He researched the law on medical marijuana distribution. See paragraphs 2-3 of Declaration of Charles Lynch ("Lynch Dec.") (Doc. No. 246). By January 2006, he opened a medical marijuana dispensary in Atascadero, California. That venture was "short lived" because the city officials used zoning restrictions to close his shop. Sent. Rec. Let. at page 4 (Doc. No. 314); PSR at ¶ 10 (Doc. No. 259).

Prior to opening the CCCC in Morro Bay, Lynch took a variety of steps. They included, inter alia: 1) calling an office of the Drug Enforcement Agency ("DEA") where, according to Lynch, he inquired regarding the legality of medical marijuana dispensaries;[9] 2) hiring a lawyer (Lou Koory) and seeking advice in regards to his

---

[8]    As stated in the Government's Sentencing Position for Defendant Charles C. Lynch (Doc. No. 232) at page 1, "[t]he government adopts the factual findings in the PSR, including the summary of offense conduct and relevant conduct."

[9]    At the trial, Lynch testified as to having telephoned a DEA branch office to inquire about the legality of medical marijuana dispensaries. He also placed into evidence a copy of his phone records which showed that contact was made between his telephone and the DEA's branch office for a number of minutes. However, Lynch did not have any record as to the identity of the purported DEA employee to whom he spoke or what exactly was said by the employee.

Lynch raised the telephone conversation as the basis for an "entrapment by estoppel" defense. See generally United States v. Batterjee, 361 F.3d 1210, 1216 (9th Cir. 2004). Given the verdict, it is clear that the jury found that Lynch had failed to meet his burden of establishing that defense. In so deciding, the jury did not necessarily find that Lynch had lied in regards to having phoned the DEA, talking to a DEA official, and/or (as a result of that discussion) concluding that his operating a medical marijuana facility would not violate federal or state law. This is because the jury was instructed in regards to the entrapment by estoppel defense that the defendant bore the burden of proving by a preponderance of the evidence each of the following five elements:

1)      an authorized federal government official who was empowered to render the claimed erroneous advice,

2)      was made aware of all the relevant historical facts, and

-13-

operations (see Lynch Decl. at ¶ 4, Doc. No. 246); 3) applying to the City for a business license to operate a medical marijuana dispensary, which he obtained (id. at ¶ 7); and 4) meeting with the City of Morro Bay's Mayor (Janice Peters), city council members, the City Attorney (Rob Schultz) and the City Planner (Mike Prater) (id. at ¶ 8). The aforementioned city officials did not raise any objections to Lynch's plans. However, the City's Police Chief issued a February 28, 2006 memorandum as to Lynch's business license application indicating that, while the medical marijuana dispensary might be legal under California law, federal law would still prohibit such an operation and "California law will not protect a person from prosecution under federal law."[10]  Trial Exhibit No. 179; see also Trial Exhibit No. 180.

The CCCC was not operated as a clandestine business. It was located on the second floor of an office building with signage in the downtown commercial area. See Declaration of Janice Peters at ¶ 4 (Doc. No. 246). An opening ceremony and tour of the facilities were conducted where the attendees included the city's Mayor and members of the city council. Id. Both the Mayor and Lynch separately passed out their business cards to proprietors of commercial establishments within the immediate vicinity of the CCCC who were told that, should they have any concerns or complaints about the CCCC's activities, they should notify either the Mayor or Lynch. Id. at ¶ 5; see also Lynch Decl. at ¶ 6 (Doc. No. 246). No one ever contacted either the Mayor

---

       3)      affirmatively told the Defendant that the proscribed conduct was permissible,
       4)      the defendant relied on that incorrect information, and
       5)      Defendant's reliance was reasonable.
See Jury Instruction No. 34 (Doc. No. 172). The jury was also instructed that "mere ignorance of the law or a good faith belief in the legality of one's conduct is no excuse to the crimes charged in the Indictment." Id.

[10]    In response to the Police Chief's memorandum, on March 13, 2006, the City Attorney for Morro Bay issued a legal opinion and justification to approve and issue a business license for CCCC, even though "under federal law the distribution of marijuana even for medical purposes and in accordance with the CUA could still lead to criminal prosecution." See Exhibit 9 to Notice of Lodging of Mr. Lynch's Initial Position Re: Applicability of the Mandatory Minimum Sentence (Doc. No. 244).

or Lynch to make a complaint. Id.

Lynch employed approximately ten people to help him run CCCC as security guards, marijuana growers, and sales staff. See PSR at ¶ 9. He worked at the store most days. Id. He ran background checks on prospective employees and did not hire anyone with a felony record or who was an "illegal alien."[11] See Lynch Decl. at ¶¶ 15, and 22 (Doc. No. 246). Employees signed in and out via an electronic clock and Lynch ran payroll through "Intuit Quickbooks." Id. at ¶¶ 22-23. Employees had to execute a "CCCC Employee Agreement" which contained various disclosures and restrictions.[12] See Exhibit 11 to Burkdoll Decl. (Doc. No. 236).

Lynch installed a security system which included video recording of sales transactions within the facility. Lynch Decl. at ¶ 17; see also PSR at ¶ 9. The CCCC kept "detailed business records" of its purchases and sources of the marijuana. See PSR at ¶¶ 37-38. It likewise had extensive records as to its sales, including copies of the customers' medical marijuana authorizations and driver's licenses. See Redacted Indictment ¶ B-4 of Count One on page 3 (Doc. No. 161). No one under 18 was permitted to enter unless accompanied by a parent or legal guardian. Lynch Decl. at ¶ 17. Entrance to the CCCC was limited to law enforcement/government officials, patients, caregivers and parents/legal guardians. Id. at 29.

Before being allowed to purchase any marijuana product, a customer had to provide both medical authorization from a physician and valid identification. Id. at ¶ 27; see also PSR at ¶ 21. The status of the doctors listed on the medical authorization forms were also checked with the California Medical Board website. Lynch Decl. at ¶ 25. CCCC also had a list of physicians who could re-issue expired

---

[11] Three of these employees (Justin St. John, Chad Harris and Michael Kelly) were 19 years old when hired. See Trial Exhibits. 117-18 and 123-24.

[12] The CCCC Employment Agreement included the following language: "I understand that Federal Law prohibits Cannabis but California Law Senate Bill 420 allows Medical Cannabis and gives patients a constitutional exception based on the 10th Amendment to the United States of America [sic]."

medical authorization cards.[13]   A customer would have to sign a "Membership Agreement Form" wherein the buyer had to agree to the listed conditions which included, inter alia: not opening the marijuana container within 1000 feet of the CCCC, using the marijuana for medical purposes only, abiding by the California laws regarding medical marijuana, etc.  See Exhibit 10 to Burkdoll Decl.  In addition, the customer had to execute a CCCC "Designation of Primary Caregiver" form wherein the buyer: 1) certified that he or she had one or more of the medical conditions which provide a basis for marijuana use under the CUA, and 2) named the CCCC as his or her "designated primary caregiver" in accordance with Cal. H & S Code § 11362.5(d) and (e).  Id. at Exhibit 9.  Evidence presented at trial showed that the CCCC not only sold the marijuana but also advised customers on which varieties to use for their ailments and on how to cultivate any purchased marijuana plants at their homes.

Nearly all of the persons who supplied the marijuana products to the CCCC (referenced as "vendors") were themselves members/customers of the CCCC.  See Report of Investigation at ¶ 3, Exhibit 1 to Burkdoll Decl.  Lynch documented "the weight, type, and price of marijuana that he purchased from "vendors."  Id.  Between CCCC's opening in April of 2006 to its closing in about April of 2007, CCCC paid vendors over $1.3 million for marijuana products.  Id. at ¶ 4.  During that period, the top ten suppliers were paid between $150,097.50 and $30,567.50.  Id.  Lynch was

---

[13]    The original indictment included a second defendant, Dr. Armond Tollette, Jr., who was charged with, inter alia, writing up physician's statements authorizing marijuana for customers to use at CCCC and other locations for cash payments but without first determining any medical needs of the customers.  See Indictment at pages 3-6 (Doc. No. 1).  Prior to Lynch's trial, Tollette pled guilty to the Count One conspiracy charge.  See Tollette Plea Agreement at page 4-6 (Doc. No. 96).  Part of the "Factual Basis" for the plea was an admission that "On November 11, 2006, defendant received and read a facsimile from the Morro Bay store warning defendant that [Confidential Source 1] was working for law enforcement."  Id. at page 5.  However, Tollette never stated or admitted that he conspired with Lynch, or whether Lynch knew or should have been aware of his illegal activity.  The Government did not call Tollette as a prosecution witness at trial.  Lynch has stated that he "never met Dr. Tollette until I was arrested."  Lynch Decl. at ¶ 11.  As stated on page 6 of the Sent. Rec. Let., "there is no dedicated [sic] connection between the defendant and Tollette such that Tollette was the only doctor referring customers to the CCCC and the CCCC, in turn, was sending potential customers only to Tollette."

CCCC's third largest provider and received $122,565. Id. The second highest supplier

was John Candelaria II, who was a CCCC employee during part of the relevant time.

Id.

Lynch maintains that he did not open CCCC to make money and that he never

got his initial investment back. See Lynch Decl. at ¶ 24. The DEA claims that, based

upon CCCC's records between April 2006 and March 2007, CCCC had sales of $2.1

million. See ¶ 2 of Exhibit 1 to Burkdoll Decl. However, neither side has provided an

actual/reliable accounting to this Court as to CCCC's business records to determine to

what extent, if any, CCCC was a profitable venture.[14]

As noted in the Sent. Rec. Let. at page 5, Lynch hired certain employees "who,

by their conduct and association to the CCCC, undermined the defendant's well-

intended purpose of helping those in need of medical marijuana." For example, one

employee (Abraham Baxter) sold $3,2000 worth of marijuana from the CCCC to an

undercover agent away from the premises without the prerequisite production of any

medical authorization. Id. However, there was "nothing to indicate that the defendant

knew of Baxter's extracurricular activities other than defendant's own meticulous

accounting should have alerted him of unexplained inventory reductions." Id. at page

6.[15] Baxter has submitted a videotaped statement that Lynch was unaware of Baxter's

improper sales. See Doc. No. 277. Likewise, there is evidence of observations by San

Luis Obispo County Sheriffs of two CCCC employees (i.e. John Candelaria and Ryan

Doherty) distributing bags and packages to persons immediately outside of the CCCC

---

[14]     The Government has submitted a July 15, 2008 expert designation letter from Lynch's counsel which
stated that Defendant's expert (i.e. Carl Knudsen) would be expected to testify that the $2.1 million sales
figure is incorrect and that "Lynch made less than $100 thousand from his enterprise." See page 1of Exhibit
B to Kowal Declaration attached to Government's Opposition to Defendant's Second Motion for New Trial
(Doc. No. 201). However, Knudsen did not testify and no report or other evidence was received from him
or admitted at trial.

[15]     There was evidence at trial that certain quantities of the processed marijuana were not pre-packaged.
Hence, one may question whether it is reasonable to expect Lynch to have been aware of isolated instances
of pilferage by employees.

premises or exiting the CCCC with such bags/packages and thereafter driving off in their respective vehicles. PSR at ¶¶ 26-27.[16] The Sent. Rec. Let. at page 5 states:

> While the defendant and the CCCC may have sold marijuana to some people with a legitimate need for alternative medical treatment, it is obvious that the CCCC was also providing marijuana to people with no medical need but an authorization in hand. Undercover officers observed customers walking in to [sic] the store and leaving the store on rolling shoes. A total of 277 customers were under age 21 which makes it unlikely that they would suffer from disease. And so it appears that the defendant and his CCCC employees knowingly provided marijuana to anyone holding an authorization and did very little to confirm the customer's true justification for holding the authorization.

The USPO's above-stated conclusions are highly questionable. First, if the CCCC checked the status of the doctors who issued the medical marijuana authorization and found them to be in good standing with the California Medical Board (as Lynch claimed - see Lynch Decl. at ¶ 25 - and the Government did not rebut), on what other basis would the CCCC determine whether or not the customer had a legitimate need for the marijuana? There was no physician stationed at the facility to conduct medical exams. Second, the fact that certain customers were able to walk into the store and leave "on rolling shoes" does not preclude them from having certain conditions specified in the CUA such as cancer, AIDS or migraines. Likewise, the USPO's assumption that persons under age 21 are unlikely to "suffer from disease" is unfounded in the context of persons who have gone to doctors and obtained medical authorizations for medicinal marijuana. While it might be argued (based on speculation) that persons who are physically able to leave the store on "rolling shoes" or are under the age of 21 might be more likely to have obtained their medical authorization by fraud or through unscrupulous physicians such as Dr. Tollette, that

---

[16] There is no evidence that all of the bags/packages contained marijuana products or that any purported marijuana therein came from the CCCC. As noted above, Candelaria on his own cultivated marijuana for sale to purchasers. Likewise, the transportation of marijuana by a primary caregiver would not have been in violation of the CUA or MMPA. Also, except for uncorroborated hearsay purportedly from Doherty (see pages 7-10 of Exhibit 18 to Burkdoll Decl., Doc. No. 236), there is no evidence that Lynch was aware of those incidents.

-18-

argument/supposition would be insufficient to establish fault on the part of a marijuana dispensary such as the CCCC which has checked the standing of the issuing physicians.

On March 29, 2007, DEA agents executed a search warrant at the CCCC and Lynch's home. PSR at ¶ 29. Processed marijuana, marijuana plants, hashish and other marijuana products were seized along with CCCC's business records. Id. at ¶¶ 29-34. The agents did not shut the facility down at that time and Lynch continued to operate the CCCC for another five weeks. Id. at ¶ 30.

As calculated by the USPO, the total amount of marijuana involved in this case is:

Actual Marijuana Recovered and Tested by DEA . . . . . . . . . . . . . 5.617 kilograms

Marijuana Determined by Extrapolation of Business Records . . .496.200 kilograms

THC recovered and tested by DEA (marijuana conversion:
277.9 grams of THC is the equivalent of 1,389.5 grams
of marijuana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1.389 kilograms

Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 503.206 kilograms

Id. at ¶ 52 (footnote omitted).

## III.  SENTENCING GUIDELINES

### A.  Offense Level Computation

Given Lynch's conviction on multiple counts, initially it must be determined whether there are groups of closely related counts as per §§ 3D1.1(a) and 3D1.2 of the United States Sentencing Commission, Guidelines Manual (Nov. 2009) ("USSG" or "Guidelines").[17]  Counts One (conspiracy to distribute marijuana), Four (possession with intent to distribute marijuana) and Five (maintaining a premises for the distribution of marijuana) can be grouped together (henceforth collectively "Counts

---

[17]  The November 2009 Edition of the Guidelines Manual was issued after Lynch's conviction. Typically, clarifying but not substantive amendments to the Guidelines are applied retroactively, unless the retroactive application would disadvantage the defendant and give rise to an ex post facto clause violation. See United States v. Lopez-Solis, 447 F.3d 1201, 1204 (9th Cir. 2006).  In this case, the November 2009 Edition does not materially alter any Guidelines provision which is applicable in this case.

1/4/5") under USSG § 3D1.2(b) as they involve the same victim ("societal interest")[18] and actions which are part of a common plan.  See PSR at ¶¶ 47-48.  Counts Two and Three (distribution of more than 5 grams of marijuana to a person under the age of 21) are grouped together (henceforth collectively "Counts 2/3") under USSG § 3D1.2(b) because they involve the same victim (Justin St. John - the underage recipient) and connected transactions.  However, Counts 2/3 are not grouped with Counts 1/4/5 because they involve separate victims/harms.  See PSR at ¶ 49.

### 1. Counts 1/4/5

When calculating the offense level for a group of counts, one uses the most serious (i.e. highest offense level) of the individual counts.  USSG § 3D1.3(a).  As to Counts One, Four and Five (as alleged and proven at trial), Count One is the most serious.  For a conspiracy charge under 21 U.S.C. § 846, the base offense level is determined pursuant to the Drug Quantity Table set forth in USSG § 2D1.1(c).  Here, there is sufficient evidence that the amount of marijuana and related marijuana products involved as to Count One was between 400 and 700 equivalent kilograms of marijuana-containing substances (see PSR at ¶ 52) which would fall within USSG § 2D1.1(c)(6) for a base offense level of 28 as to Counts 1/4/5.

In the PSR at ¶ 55, the Probation Office proposed an additional 4 level increase pursuant to USSG § 3B1.1(a) which provides: "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ."  The Government proposes increasing the base number not only pursuant to USSG § 3B1.1(a) but also by an additional level under USSG 2D1.2(a)(2) for "sales to minors."  See Government's Amended Response to Presentence Report at page 1 (Doc. No. 251).  For the reasons stated below in its discussion of the safety valve element in 18 U.S.C. § 3553(f)(4), this Court would not find Lynch to be an

---

[18]    As stated in USSG § 3D1.2, comment (n.2): "For offenses in which there are no identifiable victims (e.g. drug . . . offenses, when society at large is the victim), the 'victim' for purposes of subsections (a) and (b) is the societal interest that is harmed."

"organizer/leader" for purposes of enhancing his criminal sentence. As to the Government's citation to USSG § 2D1.2(a)(2), the Court would find it to be literally applicable.

In sum, the offense level for Counts 1/4/5 would be 29.

### 2. Counts 2/3

Counts Two and Three involve the distributions of marijuana in amounts over 5 grams to Justin St. John who was between 19 and 21 years, in violation of 21 U.S.C. § 859. The applicable guideline for the crime is USSG § 2D1.2. The USPO in the PSR attempts to utilize § 2D1.2(a)(1) which provides for "2 plus the offense level from 2D1.1 applicable to the quantity of controlled substance directly involving . . . an underage . . . individual . . . ." The evidence at trial was that St. John (an employee at the CCCC who had a medical marijuana authorization) was given 17.5 and 14 grams of marijuana on two separate occasions. See PSR at ¶ 59. The Probation Office then notes that, based upon CCCC's records, there were 277 underage customers and that, if one were to take the average amount of marijuana which St. John had received on those dates (i.e. 15.75 grams) and multiplied it by 277, the resulting amount would be 4.363 kilograms. That amount of drugs, under USSG § 2D1.1(c)(14), would give a base offense level of 12, which plus 2 under § 2D1.2(a)(1) would equal 14. Id.

However, this Court would find USPO's methodology to be based on pure speculation - that the average of the amounts which St. John (a CCCC employee) received on the two aforementioned occasions should be used as a multiplier for the 277 underage customers.[19] Instead, this Court would select the 13 offense level in USSG § 2D1.2(a)(4) which is utilized where the other subsections are not applicable.

### 3. Total Offense Level

---

[19] For example, it is noted that in the Redacted Indictment provided to the jury (Doc. No. 161) in paragraphs 5 and 6 on page 4, there is reference to six distributions of marijuana to Justin St. John, one of which was only 3 grams. Further, St. John cannot be considered a typical or average CCCC customer since he was one of its employees and at least one of the distributions was supposedly a birthday gift.

Because the offense level for the Counts 2/3 group is more than 9 levels below the Counts 1/4/5 group, no additional enhancement for an "adjusted combined offense level" is added to the Counts 1/4/5 group total of 29 pursuant to USSG § 3D1.4.

In light of the above, the total offense level in Lynch's case is 29.

**B. <u>Lynch's Criminal History and Resulting Guidelines Range</u>**

According to the PSR, Lynch does not have any prior arrests or convictions which would be applied in determining his criminal history category. <u>See</u> PSR at ¶¶ 76-79. Therefore, he falls within category I. The Sentencing Guidelines range for an offense level of 29 and a criminal history category I would be 87 to 108 months.

**C. <u>Mandatory Minimum Sentences</u>**

The convictions of the crimes in Counts One, Two and Three provide for statutory minimum sentences unless some exception can be found to avoid their application.

In Count One, the jury found Lynch guilty of violating 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), 846, 856 and 859, including a specific finding that the crime involved "at least 100 kilograms of a mixture or substance containing a detectable amount of marijuana" and "at least 100 marijuana plants . . . ." <u>See</u> Verdict at pages 2-3 (Doc. No. 175). 21 U.S.C. § 841(b)(1)(B)(vii) provides that such amounts require that the defendant "shall be sentenced to a term of imprisonment which may not be less than 5 years . . . ."

The jury convicted Lynch of Counts Two and Three charging him with distribution of marijuana to persons under the age of 21 in violation of 21 U.S.C. §§ 841(a)(1) and 859(a). In doing so, the jury specifically found that the amounts involved in such count exceeded 5 grams. <u>See</u> Verdict at pages 4-5. Under 21 U.S.C. § 859(a), the "term of imprisonment under this subsection shall not be less than one year."

**D. <u>Sentencing Positions</u>**

Using an offense level of 32 and the criminal history category I which resulted

in a guidelines sentencing range of 121 to 151 months, the USPO's recommendation was to utilize the mandatory minimum sentence of 60 months and four-year period of supervised release as to Count One. The USPO stated:

> It is the undersigned officer's position that a sentencing range of 121 to 151 is excessive and that the nature and circumstances of the offense as well as the defendant's history and characteristics provide ample reasons to justify a sentence below this guideline range. The defendant has no prior convictions. Prior arrests were either dismissed or rejected for prosecution. He is a college graduate with skills in computer programming. He owns and operates a computer business which he expects will earn income in the future. His family and friends are very supportive of him and do not believe that he should be the victim of his conflict in federal and state laws. The defendant is now on the verge of losing his home. His credit card accounts are high as he shifts debt from one account to another to make ends meet.

See Sent. Rec. Let. at page 6.

Using an offense level of 33 and criminal history category I which resulted in a guidelines sentencing range of 135 to 168 months, the Government also concurred that 60 months incarceration followed by four years of supervised release was an appropriate sentence. See Government's Amended Sentencing Recommendation for Defendant Charles C. Lynch at page 1 (Doc. No. 252). As stated by the Government:

> As explained below, while a sentence well below the Guidelines is appropriate, a significant period of incarceration is warranted given: (1) defendant's sales to numerous minors, (2) the fact that defendant always knew he was violating federal law, (3) the fact that defendant's business violated state law, and was pervaded by transactions and behavior far from the contemplation of even a generous interpretation of California law, and (4) other factors set forth in § 3553(a).

Id.

Defendant seeks a "time-served sentence to be followed by a one-year term of supervised release" assuming that the mandatory minimum sentences as to Counts One, Two and Three can be circumvented. See Defendant's Reply to Government's Position re: Applicability of the Mandatory Minimum Sentences at page 17 (Doc. No. 254). Alternatively, Defendant argues that "if the Court holds that a term of

imprisonment must be imposed [i.e. if either of the mandatory minimum sentences cannot be avoided], Mr. Lynch should be ordered to serve that term of imprisonment in his home." See Charlie Lynch's Supplemental Memorandum of Points and Authorities Re: Sentencing at page 14 (Doc. No. 285).

## IV.   DISCUSSION

### A.   Applicable Law

The Ninth Circuit in its en banc decision in United States v. Carty, 520 F.3d 984, 990 (9th Cir.), cert. denied, 553 U.S. 1061 (2008), delineated the "basic framework . . . for the district courts' task . . . [in sentencing] under the Booker remedial regime in which the Guidelines are no longer mandatory but are only advisory." As stated therein:

> The overarching statutory charge for a district court is to "impose a sentence sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a) and (a)(2).
>
> All sentencing proceedings are to begin by determining the applicable Guidelines range. The range must be calculated correctly. In this sense, the Guidelines are "the 'starting point and the initial benchmark,'" Kimbrough, 128 S.Ct. at 574 (quoting Gall, 128 S.Ct. at 596), and are to be kept in mind throughout the process, Gall, 128 S.Ct. at 596-97 n. 6.
>
> The parties must be given a chance to argue for a sentence they believe is appropriate.
>
> The district court should then consider the § 3553(a) factors to decide if they support the sentence suggested by the parties, i.e., it should consider the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed; the kinds of sentences available; the kinds of sentence and the sentencing range established in the Guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims. 18 U.S.C. § 3553(a)(1)-(7); Gall, 128 S.Ct. at 596-97 n.6.
>
> The district court may not presume that the Guidelines range is reasonable. Rita, 127 S.Ct. at 2465 (citing Booker, 543 U.S. at 259-60, 125 S.Ct. 738; Gall, 128

-24-

S.Ct. at 596-97. Nor should the Guidelines factor be given more or less weight than any other. While the Guidelines are to be respectfully considered, they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence. <u>Kimbrough</u>, 128 S.Ct. at 570; <u>Gall</u>, 128 S.Ct. at 594, 596-97, 602.

The district court must make an individualized determination based on the facts. However, the district judge is not obliged to raise every possibly relevant issue sua sponte. <u>Gall</u>, 128 S.Ct. at 597, 599.

If a district judge "decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." <u>Id.</u> at 597. This does not mean that the district court's discretion is constrained by distance alone. Rather, the extent of the difference is simply <u>a</u> relevant consideration. At the same time, as the Court put it, "[w]e find it uncontroversial that a major departure should be supported by a more significant justification than a minor one." <u>Id.</u> This conclusion finds natural support in the structure of § 3553(a), for the greater the variance, the more persuasive the justification will likely be because other values reflected in § 3553(a) -- such as, for example, unwarranted disparity -- may figure more heavily in the balance.

Once the sentence is selected, the district court must explain it sufficiently to permit meaningful appellate review. A statement of reasons is required by statute, § 3553(c), and furthers the proper administration of justice. <u>See</u> <u>Rita</u>, 127 S.Ct. at 2468 (stating that "[c]onfidence in a judge's use of reason underlies the public's trust in the judicial institution"). An explanation communicates that the parties' arguments have been heard, and that a reasoned decision has been made. It is most helpful for this to come from the bench, but adequate explanation in some cases may also be inferred from the PSR or the record as a whole.

What constitutes a sufficient explanation will necessarily vary depending upon the complexity of the particular case, whether the sentence chosen is inside or outside the Guidelines, and the strength and seriousness of the proffered reasons for imposing a sentence that differs from the Guidelines range. ****

The district court need not tick off each of the § 3553(a) factors to show that it has considered them. We assume that district judges know the law and understand their obligation to consider all of the § 3553(a) factors, not just the Guidelines. <u>See</u> <u>Walton v. Arizona</u>, 497 U.S. 639, 653, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) ("Trial judges are presumed to know the law and to apply it in making their decisions."), *overruled on other grounds* by <u>Ring v. Arizona</u>, 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

520 F.3d at 991-92 (footnote omitted).

**B. The Court Will Sentence Lynch Outside the Advisory Guideline System**

Even before the sea change as to federal sentencing law in the wake of United States v. Booker, 543 U.S. 220 (2005), the Supreme Court observed in Koon v. United States, 518 U.S. 81, 94 (1996), that "each Guideline [was formulated] to apply to a heartland of typical cases. Atypical cases were not 'adequately taken into consideration' and factors that may make a case atypical provide potential bases for departure." More recently, the Supreme Court has observed that "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." Nelson v. United States, ___ U.S. ___, 129 S.Ct. 890, 892 (2009) (per curiam). The Court has also rejected a "rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." Gall v. United States, 552 U.S. 38, 47 (2007); see also. United states v. Autery, 555 F.3d 864, 872 (9th Cir. 2009) (a sentence outside of the Guidelines is not presumed to be unreasonable).

Here, there can be no doubt that the present case falls outside of the heartland of typical marijuana distribution cases for a number of very obvious reasons including, but not limited to: 1) the passage of California's CUA and MMPA which decriminalized the cultivation, possession and distribution of marijuana under state law to the extent and for the purposes described in those laws; 2) the objective of the distribution here was (at least in primary part, if not in total) to provide the marijuana for therapeutic reasons to persons with diagnosed medical needs pursuant to California state laws; 3) the Defendant's notifying governmental authorities (including certain law enforcement agencies) of his plans/activities prior to engaging in them; 4) the Defendant's operating publicly in an obvious and known location; 5) the extensive steps which Defendant took to minimize the criminal aspects of the CCCC (e.g. by getting a business license for the marijuana distribution from the City of Morro Bay); and 6) the Defendant's maintaining copious records which completely delineated the details and extent of CCCC's operations, including the names and addresses of its vendors and customers, the amounts of marijuana purchased/distributed, etc.

Indeed, none of the parties (nor the USPO) herein have relied upon or are arguing for the application of a regular Guidelines sentence as to Lynch. Additionally, as discussed below, this Court finds that the factors under 18 U.S.C. § 3553(a) warrant proceeding outside of the Guidelines system.

## C. The Application/Non-application of Mandatory Minimum Sentences

### 1. Mandatory Minimum Sentences

Based on the findings of the jury herein, Lynch's convictions on Counts One, Two and Three raise the issue of the application of statutory mandatory minimum sentences. Unlike the Guidelines which are only advisory, a sentencing court cannot simply decide in its discretion to refuse to impose a minimum sentence required by a statute. See generally United States v. Harris, 154 F.3d 1082, 1084 (9th Cir. 1998).

Congress enacted the statutory penalties commonly called "mandatory minimums" in 1984 with the aim of providing "a meaningful floor" in sentences for certain "serious" federal controlled substance offenses. See H.R. Rep. No. 460, 103rd Cong. 2nd Sess. at 3-4, 1994 WL 107571 (Leg. Hist.). "With respect to drug trafficking, the Anti-Drug Abuse Act of 1986 [Pub. L. No. 99-570, 100 Stat. 3207] established two basic tiers of mandatory minimums for drug-trafficking -- a five-year and ten-year imprisonment penalty." Id. Those minimum penalties were triggered exclusively by the type and amount of the controlled substance involved based upon the expectation that the designated drug quantities would target "kingpin" traffickers (with the 10 year minimum penalty) and "middle-level" traffickers (with the 5 year penalty). Id.

### 2. Sentencing Manipulation

Lynch has raised an argument regarding "sentencing entrapment/imperfect entrapment" which appears to be what has been labeled in cases as the "sentencing manipulation" defense. Sentencing manipulation "focuses on the government's conduct," and arises when the government engages in actions which allow "prosecutors to gerrymander the district court's sentencing options and thus [the] defendant's

sentences."[20]  United States v. Sanchez, 138 F.3d 1410, 1414 (11th Cir. 1998). Sentencing manipulation, if present, raises a question as to whether there is a due process violation.  United States v. Torres, 563 F.3d 731, 734 (8th Cir. 2009).  The availability and applicability of the sentencing manipulation defense is the subject of considerable disagreement among the federal courts of appeal.  See United States v. Oliveras, 2010 U.S. App. LEXIS 393, *9-11 & n. 5 (2d Cir. Jan. 8, 2010).  The Sanchez decision does note that, as of 1998, "[n]o court of appeals has overturned a conviction or departed downward on the basis of a sentencing manipulation claim." 138 F.3d at 1414.

In United States v. Baker, 63 F.3d 1478, 1499-1500 (9th Cir. 1995), the Ninth Circuit rejected sentencing manipulation as a "bar to prosecution" where the defendant claimed that the Government unnecessarily prolonged its investigation of the contraband cigarette trafficking scheme for the sole purpose of increasing the defendants' sentencing exposure.  The court explained its reasoning as follows:

> The viability of sentencing manipulation as a valid doctrine is uncertain.  No court has held, however, that sentencing manipulation can serve as a complete bar to prosecution. In United States v. Jones, on which [defendant] relies, the Fourth Circuit, in suggesting outrageous government conduct can serve as a valid defense to a crime, warned that "as a practical matter, only those claims alleging violation of particular constitutional guarantees are likely to succeed."  Jones, 18 F.3d at 1154.  There is no such allegation in this case.
>
> *    *    *    *
>
> [Defendant] asserts only that the government stretched out its investigation after it had sufficient evidence to indict. This may be true, but we decline to adopt a rule that, in effect, would find "sentencing manipulation" whenever the government, even though it has enough evidence to indict, opts instead to wait in favor of continuing its investigation. See Jones, 18 F.3d at 1155.
>
> Such a rule "would unnecessarily and unfairly restrict the discretion and judgment of investigators and prosecutors."

---

[20]    Sentencing manipulation is different than sentencing entrapment.  The latter occurs when "a defendant, although predisposed to commit a minor or lesser offense, is entrapped into committing a greater offense subject to a greater punishment."  Sanchez, 138 F.3d at 1414; see also United States v. Si, 343 F.3d 1116, 1128 (9th Cir. 2003).

Id. at 1145.  "Police . . . must be given leeway to probe the depth and extent of a criminal enterprise, to determine whether coconspirators exist, and to trace . . . deeper into the distribution hierarchy."  United States v. Calva, 979 F.2d 119, 123 (8th Cir. 1992).

Id. at 1500.  The question here is not whether sentencing manipulation can serve as a bar to prosecution or as a basis for reversal of a conviction, but whether it can be utilized to avoid the statutory mandatory minimum sentence which is applicable because the predicate amount has been met over time.

This Court would find that, in the appropriate situation, improper conduct by Government agents can give rise to the sentencing manipulation defense which, in turn, could justify a decision not to impose a statutory minimum sentence.  However, Defendant herein has not presented sufficient evidentiary material to warrant that result.

For sentencing manipulation to be found, the defendant must show some high degree of outrageous or improper conduct to justify the non-application of the statutory minimum sentence.  In the cases cited by Defendant such as United States  v. Garza-Juarez, 992 F.2d 896 (9th Cir. 1993), and United States v. Takai, 941 F.2d 738 (9th Cir. 1991), the courts were merely dealing with conduct which they found would support a downward departure under the Guidelines.  Here, Lynch is seeking much more, but has presented much less.  Lynch has not proffered even evidence of any "aggressive encouragement of wrongdoing" (as was found in Garza-Juarez, 992 F.2d at 912) or any intentional decision on the part of federal law enforcement to delay arresting him for the purpose of allowing his enterprise to eventually accumulate sufficient sales/distributions of marijuana in order to ratchet his sentence to a statutory mandatory minimum level.[21]

---

[21]     This Court would, however, agree with Lynch that, unlike the law enforcement officers in Baker (63 F.3d at 1500) who needed "leeway to probe the depth and extent of the criminal enterprise," CCCC's operations were conducted not in stealth but publicly and prominently.  Indeed, the vast majority of the evidence presented to the jury was obtained from Lynch's and CCCC's records and premises which could have been acquired at any point pursuant to a search warrant which, in turn, could have been procured at any

-29-

### 3. **Application of the Safety Valve**

18 U.S.C. § 3553(f) provides a "safety valve" whereby a court need not apply the statutory minimum sentence to certain designated drug crimes where the defendant by a preponderance of the evidence establishes the five conditions set out in that subsection.  See United States v. Alba-Flores, 577 F.3d 1104, 1107 (9th Cir. 2009). That provision would come into play for violations of 21 U.S.C. §§ 841 and 846 (which are involved as to Count One), but could not be utilized for convictions under 21 U.S.C. § 859 (which is the basis for Counts Two and Three).  Therefore, the one year mandatory minimum sentence in 21 U.S.C. § 859 must be imposed as to Counts Two and Three.[22]  See generally United States v. Kakatin, 214 F.3d 1049, 1051 (9th Cir. 2000).

As to the safety valve's application to Count One, the Government has indicated its position that Lynch has satisfied all of the conditions in 18 U.S.C. § 3553(f) except for the fourth one.  See Government's Amended Position on Applicability of Safety Valve Provision to Defendant Charles C. Lynch at page 2 (Doc. No. 249), and Government's Notice Re Defendant Charles C. Lynch at page 1 (Doc. No. 267).  The Section 3553(f)(4) condition is:

> the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act [21 USCS § 848].

---

time after CCCC began its operations, since there has never been any dispute that CCCC was openly possessing and distributing marijuana at its store in downtown Morro Bay.

[22]    18 U.S.C. § 3553(e) also allows a court to not apply the statutory minimum sentence in cases where the Government files a motion making such a request on the basis that the defendant has provided "substantial assistance in the investigation or prosecution of another person who has committed an offense."  See generally Wade v. United States, 504 U.S. 181, 184-86 (1992).  Here, Section 3553(e) is not applicable since the Government has not filed any motion under that provision nor has Lynch claimed to have provided substantial assistance in the investigation or prosecution of some other person.

Thus, the question which must be resolved herein[23] is whether Lynch was an "organizer, leader, manager, or supervisor of others in the offense, <u>as determined under the sentencing guidelines</u>."[24] <u>Id.</u> (emphasis added).

The Sentencing Guidelines' parallel provision to 18 U.S.C. § 3553(f) is USSG § 5C1.2 which contains the identical five conditions. The Commentary - Application Notes to Section 5C1.2 state:

> "Organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines," as used in subsection (a)(4), means a defendant who receives an adjustment for an aggravating role under § 3B1.1 (Aggravating Role).

USSG § 5C1.2, comment. (n.5). USSG § 3B1.1 provides for increases to a defendant's offense level where the defendant is an "organizer, leader, manager or supervisor" in "criminal activity." As explained in the Background Commentary to USSG § 3B1.1:

> This section provides a range of adjustments to increase the offense level based upon the size of a criminal organization (<u>i.e.</u> the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense. <u>This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate.</u> The Commis-sion's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility. [Emphasis added.]

USSG § 3B1.1, comment. (backg'd.).

---

[23]    Lynch was not charged in the Indictment with (nor was the jury asked to make findings on the elements of) "engag[ing] in a continuing criminal enterprise as defined in [21 U.S.C. § 848]." Nor has the Government raised or argued any application of Section 848. <u>See</u>, <u>e.g.</u>, page 5 of Government's Amended Position on Applicability of Safety Valve Provision to Defendant Charles C. Lynch (Doc. No. 249); Government's Amended Position on Applicability of Mandatory Minimum Sentences to Defendant Charles C. Lynch (Doc. No. 250).

[24]    Two aspects of 18 U.S.C. § 3553(f)(4) should be noted. First is that the statute delegates the authority to determine/define who falls within the terms "organizer, leader, manager, or supervisor" to the United States Sentencing Commission through the latter's promulgation of its Sentencing Guidelines. Second, Section 3553(f) was enacted prior to the Supreme Court's decision in <u>Koon</u> which held that "atypical" cases (because they are not adequately taken into consideration in the formulation of the specific Guidelines) provide a "basis for departure." 518 U.S. at 94.

Initially, a question arises regarding the application herein of the Supreme Court's holding in Koon that each Guideline was formulated to apply to a heartland of typical cases and, because atypical cases were not adequately taken into consideration, factors that make a case atypical provide a basis for departure. Should the undeniable atypicality of the present case (versus the usual/normal marijuana distribution prosecution involving more than 100 kilograms of marijuana) justify a departure from the ordinary/conventional view of what characteristics/activities are used to define the status of being an "organizer, leader, manager or supervisor" of the offense? This Court believes that the answer to that question would be "yes." However, even putting aside the Koon decision, it is clear that Lynch can be found to be outside of USSG § 3B1.1 under the stated Commentary and rationales of the applicable Guidelines themselves.

"The safety valve provision was enacted to ensure that mandatory minimum sentences are targeted toward relatively more serious conduct." United States v. Thompson, 81 F.3d 877, 879 (9th Cir. 1996); see also, United States v. Acosta, 287 F.3d 1034, 1038 (11th Cir. 2002). As determined in the Sentencing Guidelines, the reason why USSG § 3B1.1 provides for an upward adjustment for "organizers, leaders, managers and supervisors" is the belief that such persons "present a greater danger to the public and/or are more likely to recidivate." USSG § 3B1.1, comment. (backg'd.). As stated in the Commentary - Application Notes to USSG § 3B1.1, "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager or supervisor of one or more participants." USSG § 3B1.1, comment. (n.2). Consequently, merely being such an organizer/leader over another participant simply qualifies a defendant for an adjustment; it does not require it. Thus, when the evidence clearly shows that the defendant in question did and does not present a greater danger to the public (and in fact has greatly reduced the criminality of the involved conduct) and is not likely to recidivate, that individual should not be considered as falling within USSG § 3B1.1 for purposes of an upward adjustment.

Normally, the amount of the illegal drugs involved in a case will be sufficiently related to lawlessness, danger to the community and culpability such that the triggering of the application of a mandatory minimum upon a pre-set benchmark amount is rational and entirely appropriate.  See generally Chapman v. United States, 500 U.S. 453, 464-65 (1991) (quantity-based mandatory minimum sentencing scheme does not violate due process or equal protection).  However, in the present situation, Lynch's activities do not demonstrate an increase of lawlessness, danger to the public or culpability which warrants the application of the mandatory minimum based upon the amount of marijuana involved in his case or the increase in offense level under USSG § 3B1.1.  In fact, it is just the opposite.

First, as noted above, the purpose of the CCCC's distribution of marijuana was not for recipients to "get high" or for recreational enjoyment.  Rather, it was pursuant to the CUA's goal of providing marijuana to Californians for medical uses as prescribed by their treating physicians.  It is recognized herein that the Supreme Court has previously pointed out that Congress has already made a "determination of value" and has found that marijuana (as a Schedule I controlled substance) has no medical benefits worthy of an exception to the application of the CSA.  See Oakland Cannabis Buyers' Cooperative, 532 U.S. at 491.  However, it was also noted that 21 U.S.C. § 811(a) allows the Attorney General, by rule, to transfer a controlled substance between the schedules or to remove it entirely in the appropriate situation.  Here, both President Obama and Attorney General Holder have indicated the current administration's position that possession and distribution of medical marijuana in conformity with state law will not be subject to federal enforcement/interdiction.[25]  While the latter will not

_____

[25]    The Government correctly argues that the CCCC was not operated in conformity with California state law because, as held by the California Supreme Court in Mentch, 45 Cal. 4th at 283-87, medical marijuana distribution operations (such as the CCCC) cannot show that they fall within the CUA's or MMPA's definition of a "primary caregiver."  As stated in Mentch, a "primary caregiver . . . must prove at a minimum that he or she (1) consistently provided caregiving, (2) independent of any assistance in taking medical marijuana, (3) at or before the time he or she assumed responsibility for assisting with medical marijuana."  Id. at 283.

serve to legitimize Lynch's activities vis-a-vis federal law, it does relate to the issues of the degree of lawlessness, danger to the public and level of culpability in regards to his conduct. While the Government has cited to certain instances where some of the CCCC's marijuana may have been obtained by persons through fraudulent medical authorizations or may have been diverted by a few employees to unlawful recipients, there is no evidence that the vast majority of the marijuana was so improperly distributed or that Lynch himself was aware of and/or participated in that misfeasance.

Second, as to the amounts of the controlled substances involved herein, the evidence demonstrates that the CCCC was generally distributing the marijuana products within the portions specified in Cal. H & S Code § 11362.77(a) (i.e. "No more than eight ounces of dried marijuana per qualified patient" or "six mature or 12 immature marijuana plants"). Thus, Lynch was not involved in the large bulk transactions which characterize "kingpin" or even middle-level traffickers. While obviously that total amount of marijuana possessed and/or distributed by the CCCC did exceed the quantity for the application of the mandatory minimum, this was over the passage of time.

Third, Lynch on his own took steps to reduce/eliminate the criminal aspects and/or potential harmful consequences of CCCC's operation (aside from the essential

---

However, the Mentch case was decided in November of 2008, years after Lynch opened the CCCC in 2006. Admittedly, there were several pre-2006 California appellate court cases which foreshadowed the holdings in Mentch. See e.g., Peron, 59 Cal. App. 4th at 1395-97 (holding that a medical marijuana club cannot be designated by a patient as his or her primary caregiver because it has not consistently assumed the responsibility for the patient's housing, health or safety); Urziceanu, 132 Cal. App. 4th at 773 ("A cooperative where two people grow, stockpile, and distribute marijuana to hundreds of qualified patients or their primary caregivers, while receiving reimbursements for these expenses, does not fall within the scope of the language of the Compassionate Use Act or the cases that construe it."). Nevertheless, until the California Supreme Court issued its ruling in Mentch, the law in this area was still somewhat unsettled. For example, in Mentch itself, the court of appeals had reversed the trial court's refusal to allow the defendant (who had cultivated marijuana for the medical use of himself, five other authorized persons, and also on occasion for medical marijuana clubs) to raise the primary caregiver defense in his criminal case. See People v. Mentch, 143 Cal. App. 4th 1461, 1475-84 (2006). Consequently, prior to the California Supreme Court's decision in Mentch, Lynch could have reasonably believed that the CCCC's operations complied with California law because it was acting in the capacity of a primary caregiver.

-34-

function of distributing marijuana to authorized recipients for medical reasons). As noted above, before opening the CCCC, he notified governmental authorities including the City of Morro Bay's mayor and city council plus various local law enforcement entities such as the county sheriffs and (according to Lynch) the DEA. Consequently, should any governmental authority have believed that some public safety issue or other societal interest warranted the prevention of any commencement of CCCC's operations, that authority could have sought to enjoin the CCCC from opening. None did. Likewise, Lynch took steps to have CCCC comply with applicable laws such as by obtaining a business license, following federal and state labor statutes, etc. Further, Lynch attempted to regulate the conduct of CCCC's employees by not hiring felons and requiring workers to sign an Employee Agreement which included promises to abide by CCCC's conduct standards and the "Conditions for Issuance of Business License" issued by the City of Morro Bay. CCCC's customers had to execute a "Membership Agreement" wherein they consented to obey "the laws of the State of California regarding medical cannabis," CCCC's rules barring the use of marijuana at certain locations and during certain activities, etc. The CCCC did business in a prominent location with appropriate signage such that its operations were not clandestine but were, in fact, subject to apparent scrutiny by law enforcement. There was no evidence that anyone ever suffered any injury of any sort as a result of Lynch's running the CCCC. Lynch kept detailed records of all purchases, sales and other relevant activities of the CCCC (including the identities and other background information as to its suppliers and customers). As a result, his prosecution was greatly facilitated by his own scrupulous record-keeping.

In sum, although Lynch did put together CCCC's operations which had about ten employees, given the way he ran the CCCC, Lynch did not present any great danger to the public and certainly no greater danger than any of his fellow participants in the CCCC. Indeed, because of Lynch, the operations of the CCCC could have been stopped at any time by law enforcement (certainly before it had involved itself with an

-35-

amount of marijuana which would have given rise to the statutory mandatory minimum sentence).  For the above reasons, this Court finds that Lynch does not fall within USSG § 3B1.1.  Hence, the Court will not increase his offense level of 29 due to an aggravating role as per section 3B1.1.  Further, the Court would find that Defendant has shown that the safety valve factors in 18 U.S.C. § 3553(f) and USSG § 5C1.2 are present.  Therefore, the five year mandatory minimum sentence in 21 U.S.C. § 841(b)(1)(B) will not be applied to Count One of Lynch's case.  Finally, his offense level will be reduced by two points as per USSG § 2D1.1(b)(11) and would equal 27. Thus, the Guidelines range for Lynch is 70-87 months.

### D. **The Sentence**

As noted above, Lynch will be sentenced outside of the Sentencing Guidelines system as his case is clearly outside of the heartland for his crimes.  The Court orders Lynch to serve the term of one year and one day as to Counts One, Two and Three (with those sentences to run concurrently) and to "time served" as to Counts Four and Five.  Pursuant to USSG § 5GI.2(c), the Court finds that the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment.  In addition, upon completion of that incarceration, Lynch is to be placed on supervised release for a period of four years as to Counts One through Four and a period of three years as to Count Five, with those terms to run concurrently.[26]

### E. **Reasons for the Sentence/ 18 U.S.C. § 3553(a) Factors**

As stated by the Supreme Court in <u>Gall</u>, 552 U.S. at 50 n.6:

> Section 3553(a) lists seven factors that a sentencing court must consider.  The first factor is a broad command to consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  The second factor requires the consideration of the general purposes of sentencing, including: "the need for the sentence imposed -- (A) to reflect the seriousness of

---

[26]  As to Count One, <u>see</u> 21 U.S.C. § 841(b)(1)(B).  As to Counts Two and Three, <u>see</u> 21 U.S.C. §§ 859(a) and 841(b)(1)(D).  As to Count Four, <u>see</u> 21 U.S.C. § 841(b)(1)(C).  As to Count Five, <u>see</u> 21 U.S.C. § 3583(b)(2).

the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2). The third factor pertains to "the kinds of sentences available," § 3553(a)(3); the fourth to the Sentencing Guidelines; the fifth to any relevant policy statement issued by the Sentencing Commission; the sixth to "the need to avoid unwarranted sentence disparities," § 3553(a)(6); and the seventh to "the need to provide restitution to any victim," § 3553(a)(7). Preceding this list is a general directive to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing described in the second factor. § 3553(a) (2000 ed., Supp. V).

## 1. <u>Nature and Circumstances of the Offense</u>

This Court has described the nature and circumstances of the offense above. Lynch's case is entirely atypical of "heartland" marijuana distribution schemes. As observed by the USPO, his conduct greatly reduced the lawlessness and danger to the public that normally would be associated with violations of 21 U.S.C. § 841(a) and (b)(1)(B)(vii). <u>See</u> Sent. Rec. Let. at page 4. Thus, the present situation warrants a sentence outside the advisory Guidelines system.

## 2. <u>History and Characteristics of the Defendant</u>

Lynch has no prior criminal convictions. While he has been arrested on four prior occasions (three of which were related to use or possession of marijuana), all of those cases were apparently dropped for lack of evidence or dismissed in the interests of justice. <u>See</u> PRS at ¶¶ 82-86.

Lynch is a 1987 college graduate with a degree in computer science. <u>Id.</u> at ¶ 111. Between 1987 and 2006, he worked as a computer programmer, technician, software developer and software engineer for four different companies. <u>Id.</u> at ¶¶ 116-17. He also started his own business in 2000 performing information technology and website development work as an independent contractor. <u>Id.</u> at ¶ 114. As a result of the present criminal matter, he is "on the verge of losing his home" and has encountered other financial difficulties. <u>See</u> Sent. Rec. Let. at page 6.

Lynch is single with no children and is presently 47 years old. He has the support of his family (his mother and many siblings) and friends.[27]

There is nothing in Lynch's background which indicates a propensity toward criminal or anti-social behavior. Indeed, but for the passage of the CUA and MMPA, it is apparent that he would not have opened the CCCC or been involved in any substantial distribution of marijuana. Further, as recognized by the USPO, Lynch's purpose in engaging in the subject conduct "was to provide marijuana to those who, under California law, [were] qualified to receive it for medical reasons." See Sent. Rec. Let. at page 4. He was not "a common drug dealer buying and selling drugs without regulation, government oversight, and with no other concern than making profits." Id.

Thus, Lynch's history and characteristics indicate that the appropriate sentence is one outside of (and substantially below) the Guidelines.

### 3. The Need for the Sentence Imposed

The seriousness of the Count One violation of 21 U.S.C. § 841(a) and (b)(1)(B)(vii) and Lynch's efforts to reduce the lawlessness and danger to public of that offense have already been discussed above. This Court does not believe that an extended period of incarceration in Lynch's case is needed to promote respect for the law or to provide a just punishment for the offense. Indeed, arguably Lynch displayed his respect for the law herein by notifying governmental authorities and law enforcement entities of his planned activities prior to engaging in them. Were all

---

[27] While simple popularity is not a factor to be considered, the Court notes that it has received more letters in support of Lynch in this matter than in any other case in the undersigned judicial officer's 16 years on the federal and state benches. That correspondence is from persons who are or were: Lynch's family members and friends, his former employers, customers of the CCCC, prospective and selected jurors in this criminal case, a CCCC employee who had been accused of criminal activity in regards to the incidents in this case (Abraham Baxter), a defendant in another medical marijuana case litigated in this federal district court (Judy Osborn), California physicians and health care therapists interested in the medical marijuana issue, various members of this country's armed forces, law enforcement officers, etc. See Exhibits attached to Charles Lynch's Position Re: Sentencing Factors (Doc. No. 245) and Letters in Support of Defendant's Position Re: Sentencing Factors (Doc. No. 264).

-38-

purported criminals so accommodating, this country would be a much safer and law-abiding place.  Consequently, this Court would find that a sentence of one year and one day suitable to afford adequate deterrence to the criminal conduct engaged in by Lynch as to Counts One, Four and Five.

As to the violations of 21 U.S.C. § 859(a) in Counts Two and Three, normally the sales of marijuana to persons under the age of 21 is a serious and all-too-common offense.  However, here the sales of marijuana by the CCCC: 1) to persons under 21 were executed pursuant to a physician's written authorization, and 2) to a minor under the age of 18 were made in the presence of an accompanying parent or legal guardian.  Thus, the seriousness of the offense is tempered to a great degree.  While the government and the USPO argue that Lynch turned a blind eye to the fact that many apparently healthy looking persons between the ages of 18 and 21 made purchases of marijuana at the CCCC with doctors' written authorizations, there is insufficient evidence to establish that Lynch was (or should have been) aware that those medical authorizations (or a substantial portion of them) were fraudulent or obtained by means of fraud.  Furthermore, here, the Court will be imposing the statutory mandatory minimum sentence as to the 21 U.S.C. § 859(a) violations.

There is no indication that Lynch needs any incarceration time to deter him from any future crimes.  Nevertheless, as already noted, this court will be sentencing Lynch to prison.  Because he has never experienced any extended detention, the period of one year and one day is more than adequate punishment in his case.

Finally, given Defendant's education, work experience and health, incarceration is not necessary to provide him with "needed educational or vocational training, medical care, or other correctional treatment."

### 4.  The Kinds of Sentences Available, the Guidelines Sentencing Range and Policy Statements Issued by the Sentencing Commission

The Court has reviewed the sentencing options discussed in the PSR at pages 26 through 28, including custody in prison, supervised release, probation, fines, and

restitution.  The Court has also gone through the Guidelines Sentencing factors both as delineated in the PSR and independently.  The Court did not find, nor did the parties or USPO reference, any relevant policy statements issued by the Sentencing Commission.

### 5.  Unwarranted Sentence Disparities

Neither party has cited to the Court any evidence or data that its sentence in this case would constitute or create an <u>unwarranted</u> sentence disparity.  Lynch's (and his conduct's) dissimilarity to other persons engaged in the distribution of marijuana warrants a different sentence.[28]  <u>See</u> <u>Autery</u>, 555 F.3d at 876.

### 6.  Restitution

As observed by the USPO in the PSR at ¶ 157, "Restitution is not an issue in this case."

## V.  CONCLUSION

For the reasons stated above and at the sentencing hearings herein, this Court in the exercise of its discretion will sentence Lynch outside of the Guidelines system and impose a sentence of one year and one day as to Counts One, Two and Three (all to run concurrently) and to "time served" as to Counts Four and Five, plus a period of supervised release of four years with concomitant provisions as to Counts One through Four and three years as to Count Five (all to run concurrently).

In closing, this Court would quote from the Supreme Court's <u>Raich</u> decision and make one last comment.

Marijuana itself was not significantly regulated by

---

[28]     Both the Government and Lynch have cited to cases wherein the respective defendants have received sentences ranging from one day to 262 months.  <u>See e.g.</u> footnote 5 and accompanying text in Government's Amended Sentencing Recommendation for Defendant Charles C. Lynch (Doc. No. 252).  The problem, however, is that neither side has provided a sufficiently detailed exposition of the facts in those cases to allow this Court to determine the similarity of the circumstances.  For example, did any of the defendants in those cases notify governmental and law enforcement entities of the operation of the medical marijuana dispensaries before engaging in the conduct; did they obtain business licenses for their operations and attempt to comply with local regulations in regards to such operations; did they check on the status of the physicians named in the medical authorizations supplied by their customers; etc.

-40-

> the Federal Government until 1937 when accounts of marijuana's addictive qualities and physiological effects, paired with dissatisfaction with enforcement efforts at state and local levels, prompted Congress to pass the Marihuana Tax Act, Pub. L. 75-238, 50 Stat. 551 (repealed 1970). Like the Harrison Act, the Marihuana Tax Act did not outlaw the possession or sale of marijuana outright. Rather, it imposed registration and reporting requirements for all individuals importing, producing, selling, or dealing in marijuana, and required the payment of annual taxes in addition to transfer taxes whenever the drug changed hands. Moreover, doctors wishing to prescribe marijuana for medical purposes were required to comply with rather burdensome administrative requirements. Noncompliance exposed traffickers to severe federal [monetary] penalties, whereas compliance would often subject them to prosecution under state law. Thus, while the Marihuana Tax Act did not declare the drug illegal *per se*, the onerous administrative requirements, the prohibitively expensive taxes, and the risks attendant on compliance practically curtailed the marijuana trade.

Raich, 545 U.S. at 11 (footnotes omitted). Currently, the situation is somewhat reversed with certain states (including California) seeking to allow the prescribing of marijuana for medical purposes and the Federal Government having the option of prosecuting persons who seek to act under the States' imprimatur. Individuals such as Lynch are caught in the middle of the shifting positions of governmental authorities. Much of the problems could be ameliorated - as suggested in Raich, id. at 33 - by the reclassification of marijuana from Schedule I.


DATED: This 29th day of April, 2010

_____
GEORGE H. WU
United States District Court Judge

-41-